UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

INFICON, INC.,

                Plaintiff,             15 Civ. 8044

   -against-                     OPINION

VERIONIX, INC. (n/k/a/ KITECH
  VENTURES, INC.),

                Defendant.

----------------------------------------X

A P P E A R A N C E S:

                Attorneys for Plaintiff

                WINSTON & STRAWN LLP
                200 Park Avenue
                New York, NY 10166
                By:  Thomas P. Lane, Esq.

                Hiscock & BARCLAY, LLP
                One Park Place
                300 South State Street
                Syracuse, NY 13202

                Attorneys for Defendant

                CALIHAN LAW PLLC
                16 West Main Street, Suite 736
                Rochester, NY 14614
                By:  Robert B. Calihan, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/21/16

**Sweet, D.J.**

The plaintiff Inficon ("Inficon" or the "Plaintiff") has moved pursuant to Federal Arbitration Act § 101(a)(3) to vacate the arbitration award issued by the International Centre for Dispute Resolution International Arbitration Tribunal dated August 19, 2015 ("the Award"). Defendant Verionix, Inc. ("Verionix" or the "Defendant") has cross moved to confirm the Award. Upon the conclusions set forth below, the motion of Inficon is denied, the cross motion of Verionix is granted, and the Award is confirmed.

**Prior Proceedings**

Inficon filed its complaint on October 13, 2015 seeking to vacate the Award which resulted from the arbitration provided for by § 9.13 of the Asset Purchase Agreement between the parties entered into on November 4, 2009 (the "APA").

Inficon manufactures and sells to semiconductor manufacturers high-end sensors (called "RGAs") that detect and identify small amounts of gases in the vacuum environments used to manufacture microchips. Verionix was founded in 2003 to

1

develop a line of gas sensors for semiconductor manufacturing. The Verionix and Inficon sensors were intended for the same group of customers (semiconductor manufacturers and original equipment manufacturers supplying the large vacuum chamber manufacturing "tools" used by those semiconductor manufacturers), were in the same general price range.

In the late summer of 2008, Verionix and Inficon entered into discussions regarding Inficon's potential acquisition of Verionix. The parties negotiated the terms of a sale and Inficon sent to Verionix a Letter of Intent on April 14, 2009, which provided that Inficon would acquire the Units. After the transmission of the letter of intent, a due diligence period commenced. After the due diligence period, on November 4, 2009, the parties executed the APA and closed the sale of Verionix's specified assets to Inficon. The consideration for the acquired assets had two components: an up-front cash payment of $550,000 plus contingent earn-out payments that depended on the total unit sales of Verionix gas sensors during the four years from the closing of the agreement, defined as the "Earn-Out Period."

2

**The Asset**

The parties defined in the APA the "commercially
reasonable efforts" required of Inficon to sell the sensors
("Units") during a four year Earn-Out Period:

> "[C]ommercially reasonable efforts" to market and
> sell the Units shall mean such efforts as a
> prudent business person acting under similar
> circumstances would use to market and sell the
> Units and achieve the sale of 2000 units over the
> Earn-Out Period, including providing the working
> capital, experienced personnel, and manufacturing
> support reasonably required.

The APA also required Inficon to determine the

sensors' merchantability pre-closing:

> Prior to the Closing, Seller shall afford Buyer a
> reasonable opportunity to inspect the units to
> determine their merchantability which
> determination shall be made in good faith by the
> parties.

*Id.* at § 1.2(b).

The APA conditioned a portion of Inficon's initial payment on
the merchantability of the sensors, providing for a reduction in
the purchase price if Verionix was unable to deliver

3

"merchantable" sensors. *Id.* As the Earn-Out Period drew to a close, Inficon had sold fewer than 40 sensors.

Verionix initiated an arbitration pursuant to APA § 9.13. The parties conducted extensive discovery, including sixteen depositions and exchanging over 70,000 documents, followed by a six and a half-day hearing involving ten fact witnesses, four expert witnesses with eight expert reports, and 476 exhibits admitted into evidence. The Panel received over 110 pages of written submissions, including 24 pages considering merchantability (including salability and manufacturability) issues and 25 pages dealing with damages. The Panel rendered a nine-page award on August 25, 2015 concluding that Inficon had breached its Earn-Out obligations, that Inficon's merchantability claim was not "credible," and awarded damages stating:

> Accordingly we find that Inficon ought to have and could have attained the sale of 1,450 Units over the Earn-Out Period. Using Verionix' (sic) method, its damages would be based upon the fraction 1450/2000=72.5%. Its claimed cumulative damages are in the total principal amount of $8,717,500. 72.5% of such amount, is $6,320,187.50, and we find that to be the principal amount of its damages.

4

After the Award was delivered, both parties made submissions to the Panel advising that certain errors were made in the above computation and requesting that the Panel correct such computational errors. Verionix asserted that the Panel improperly calculated interest (stating in the Award that the interest of the sale of 2,000 units would be reduced to 72.5% based on the reduction in principal, but reducing interest by 72.5% twice.) Inficon asserted that the Panel improperly calculated the principal amount of damages by assuming that the earn out due on the sale of 1,450 units was 72.5% of the amount due on the sale of 2,000 units.

The Panel issued a "Disposition of Parties' Applications for Modification of Final Award" on October 9, 2015, granting Verionix's request and denying Inficon's request for recalculation.

**The Applicable Standard of Review**

Although courts "play only a limited role when asked to review the decision of an arbitrator," and "only a very narrow set of circumstances delineated by statute and case law permit vacatur," a "decision of an arbitrator . . . is not totally impervious to judicial review." *Porzig v. Benson*, 497

F.3d 133, 138 (2d Cir. 2007) (internal quotation marks and
citations omitted).

There are two relevant statutory grounds for vacating
an arbitration award:

> (1) where the arbitrators were guilty of
> misconduct in refusing to hear evidence pertinent
> and material to the controversy; or of any other
> misbehavior by which the rights of any party have
> been prejudiced; or
>
> (2) where the arbitrators exceeded their powers,
> or so imperfectly executed them that a mutual,
> final, and definite award upon the subject matter
> submitted was not made.

9 USC § 10(a).

"In addition, a court may vacate an award if it exhibits a
manifest disregard of the law." *Porzig v. Dresdner, Kleinwort,
Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007) (footnote
and internal quotation marks omitted); see also *Siegel v. Titan
Indus. Corp.*, 779 F.2d 891, 894 (2d Cir. 1985).

The Second Circuit has held that "an arbitration award
should be enforced . . . if there is a barely colorable
justification for the outcome reached." *Banco de Seguros del
Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir.

6

2003) (internal citations omitted); *Wallace v. Buttar*, 378 F.3d 182, 193 (2d Cir. 2004) (internal citation omitted). Judicial review of arbitral fact finding is limited to determining whether there was any colorable basis in the record for the outcome:

> To the extent that a federal court may look upon the evidentiary record of an arbitration proceeding at all, it may do so only for the purpose of discerning whether a colorable basis exists for the panel's award. . . . A federal court may not conduct a reassessment of the evidentiary record. . . . [W]hatever the weight of the evidence considered as a whole, "if a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed."

*Wallace*, 378 F.3d at 193 (internal citations omitted).

"This court has generally refused to second guess an arbitrator's resolution of a contract dispute." *John T. Brady & Co. v. Form-Eze Systems, Inc.*, 623 F.2d 261, 264 (2d Cir. 1980); see also *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 214 (2d Cir. 2002) (stating that an arbitrator's fact findings and contractual interpretations are not subject to judicial challenge); *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 704 (2d Cir. 1978) ("When arbitrators explain their conclusions . . . in terms that offer even a

barely colorable justification for the outcome reached,

confirmation of the award cannot be prevented by litigants who

merely argue, however persuasively, for a different result.").

**The Motion to Vacate the Award Calculation of Damages is Denied**

The Panel Did Not Manifestly Disregard the Law by Awarding
Verionix Damages

Inficon has contended that the Panel manifestly

disregarded the law in determining damages. It cites its

conclusion that "since Inficon failed to employ reasonable

efforts, Verionix is entitled to the presumption that, had such

efforts been furnished, the sales would have occurred and

Verionix would have received Earn Out payments." (Award p. 5).

No authority is cited by the Panel or Verionix for this

presumption. However, beyond stating the presumption, the Panel

then proceeded to calculate based on the projections made by

Inficon in the course of making its financial reports concerning

its contingent liabilities. The Panel based its damage

calculation on those Inficon projections.

Inficon has attacked this calculation as violative of

New York law concerning lost profit calculations for new

businesses.

8

Although a plaintiff seeking lost royalties or earn-out payments is not required to prove damages with mathematical certainty, the plaintiff is required to provide a reasonable estimate of damages, supported by adequate proof. *Bloor v. Falstaff*, 601 F.2d, 609 (2d Cir. 1979). Inficon has contended that an estimate of lost profit damages is based on a stable foundation, and therefore reasonable, only if that estimate is based on expert testimony or specific market comparisons. *Id.*; see also *Zilg v. Prentice-Hall, Inc.*, No. 78 Civ. 0130-CLB, 1982 U.S. Dist. LEXIS 12209, at *111-12 (S.D.N.Y. Apr. 20, 1983) (holding pure speculation or guesswork as to damages will not qualify as a reasonable estimate of the damages incurred). *Bloor*, 601 F.2d 609.

A defendant's own projections cannot satisfy the requisite level of certainty in situations involving a new product with relatively little sales history. See *Upper Deck Co., LLC v. BreaKey Int'l BV*, 390 F. Supp. 2d 355, 361 n.1 (S.D.N.Y. 2005) (denying damages based on projections when market was new and there was limited sales history available); *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333-34 (2d Cir. 1993) (refusing to award lost profits for two-year delay in delivery of computerized product because of

9

speculative nature of proof as to market conditions and
company's possible performance during those years);
*International Telecom, Inc. v. Generadora Electrica Del Oriente*,
No. 00 Civ. 8695 (WHP), 2004 WL 784941, at *4 (S.D.N.Y. Apr. 13,
2004) (denying lost profits where plaintiff sought "to project
eight years of lost profits based on only two months revenues in
a new business venture").

        In cases involving new products or business ventures,
"[a] plaintiff's statement as to the amount of damages alone
does not provide the requisite reasonable certainty." See *RJI*
*Brands LLC v. Cognac Brisset-Aurige, S.A.R.L.*, No. 12 Civ. 1369,
2013 U.S. Dist. LEXIS 55804, *23 (S.D.N.Y. Apr. 18, 2013)
(citing *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x
206, 207 (2d Cir. 2010) ("court cannot simply rely on the
plaintiff's statement of damages; there must be a basis upon
which the court may establish damages with reasonable
certainty") (additional citations omitted)); see also *Schonfeld*
*v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000) (when analyzing
profit projections of a new business, an "entrepreneur's
cheerful prognostications are not enough") (internal quotation
and citation omitted).

10

The burden of proving general lost profit damages to the requisite level of certainty is even more difficult when the breach of contract case involves a new business or a unique product line because the plaintiff's proof regarding damages in these cases face a heightened scrutiny by the courts. See *Schonfeld*, 218 F.3d at 172. This heightened scrutiny is applicable to new business ventures because "there is no track record upon which to base an estimate" of future sales or profits. *Id.*

The only case cited in the Award is *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395 (1993). *Ashland* involved an established investment tool that the parties had tested on the market over a number of years and, although it technically involved a new business, this new business was almost identical in function to the defendant's old business. *Id.*; see also *Schonfeld*, 218 F.3d at 173 (explaining the product in *Ashland* was "a new but tested investment strategy by an existing financial management corporation with an extensive customer base").

The only evidence in the Record regarding sales of similar sensors was that customers returned nearly all of the

11

Units Verionix sold. Furthermore, Inficon's sensors, the RGAs, and the Verionix sensor were not the same product, nor did the Panel conclude that they were. Inficon's sales history and experience selling the RGA is not an appropriate basis for determining damages.

Inficon's own financial projections were used to calculate damages. While in *Ashland*, the projections were actually incorporated into the agreement between the parties, and documented as the amounts the "parties determined [the product] would earn after studying and discussing the prospects extensively." *Ashland*, 83 N.Y. at 405. The basis of the lost profits award in *Ashland* was the agreement between the parties as to the "minimum funds anticipated to be under management" and subject to the claimant's right to receive 15% of the gross revenues per annum if he left Ashland for any reason. *Id.*

With no actual market data on which to rely, Inficon in its financial liability projection estimated how many sensors would be sold in subsequent years. Those erroneous projections do not establish the reasonable estimate required in the new business context. However, the issue turns on whether a damage calculation based on a misappropriation of law constitutes

12

manifest disregard of the law requiring the District Court to
vacate the Award.

The Second Circuit Court of Appeals has repeatedly
held that "[u]nder the manifest disregard standard . . . the
governing law must clearly apply to the facts of the case, as
those facts have been determined by the arbitrator." *Westerbeke
Corp. v. Dachtsu Motor Co.*, 304 F.3d 200 (2d Cir. 2007) 200,
213. The Panel found that the Inficon projections "are
inherently reliable."

The Second Circuit Court of Appeals has at least five
times rejected the same argument Inficon makes here. In *Int'l
Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82 (2d Cir. 1996), the
Second Circuit rejected a manifest disregard of the law
challenge to an arbitration award based, as here, on the
argument that awarding lost future profits for a new venture
violated New York law. The Court reasoned that because *Ashland*
"clearly contemplates the award of such damages in some
circumstances" and "the new business rule is not a per se rule
forbidding the award of lost profits damages to new businesses,
but rather an evidentiary rule . . . it was within the authority
of the arbitrator to award lost profit damages . . . ." *Id.* at

13

85-86. The Court of Appeals reached the same result in *Sole Resort, S.A. DE C.V. v. Allure Resort Mgmt., LLC*, 2008 U.S. App. LEXIS 22507 (2d Cir. Oct. 20, 2008. In *Sole*, the respondent had argued that lost profits could not be awarded because new businesses are often unable to establish future losses with the necessary certainty and dismissed its own projections of future performance as speculation. The Court of Appeals rejected respondent's manifest disregard of the law challenge, noting that the no lost profits rule recognized exceptions, and the arbitrator had found facts that in his view provided sufficient certainty: "our task is not to reassess the evidentiary record…." *Id.* at *6-7; accord *Westerbeke Corp.*, 304 F.3d at 216 (finding no manifest disregard of the law where no New York per se rule against expectancy damages and the arbitrators' fact findings provided basis for awarding such damages for a new product); *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 24 (2d Cir. 1997) (finding no manifest disregard where arbitrator "was well aware of and carefully applied New York's law on lost profits [and] specifically addressed *Kenford Co. v. County of Erie...* which, like *Ashland*, is a seminal New York Court of Appeals damages case); *Data & Dev., Inc. v. InfoKall, Inc.*, 513 Fed. Appx. 117 (2d Cir. 2013) (finding no manifest disregard because New York law does not

14

absolutely prohibit lost profits, noting that the court must apply the manifest disregard rule to the facts "as those facts have been determined by the arbitrator" (internal quotation marks and citation omitted)). These decisions bar Inficon's manifest disregard of the law challenge based on the improper reliance on its financial projections.

In *Cole Publishing Co., Inc. v. Wiley & Sons, Inc.*, 1994 U.S. Dist. LEXIS 13786 (S.D.N.Y. Sept. 29, 1994), an arbitration respondent challenged a lost profits damages award on the ground that New York law allowed for such damages only when they were reasonably certain in amount based on a stable evidentiary foundation. This Court rejected the challenge, noting "[i]t is not for this court to reconsider that evidence, but simply to reassure itself that there was some basis for the award . . . . Although perhaps confusing, the panel's award is not without possible justification." *Id.* at \*7-8; accord *Smith v. Positive Prods.*, 419 F. Supp. 2d 437, 448-52 (S.D.N.Y. 2005) (finding no manifest disregard of the law where there was "barely colorable justification" for lost profits award); *Josephthal & Co. v. Cruttenden Roth, Inc.*, 177 F. Supp. 2d 232, 237 (S.D.N.Y. 2001) (applying "wrong" damage theory was not manifest disregard of the law).

15

The Inficon motion to vacate the Award for manifest disregard of the law is denied on the basis of the authorities set forth above.

## The Panel Did Not Deny Inficon Fundamental Fairness by Refusing to Consider Evidence of Merchantability

Inficon's FAA § 10(a)(3) challenge contends that the arbitrators "refused to consider evidence on the manufacturability, merchantability and salability of the Units, instead relying on a presumption" of merchantability. (Mem. at 12). However, this contention has not been substantiated by the Award.

FAA "[s]ection 10(a)(3) does not permit a reviewing court to reconstruct the arbitrators' thinking or the appropriate amount of weight to afford certain evidence." *Convergia Networks, Inc. v. Huawei Techs. Co.*, 2008 U.S. Dist. LEXIS 92271, at \*13 (S.D.N.Y. Oct. 29, 2008). See, e.g., *Giller v. Oracle USA, Inc.*, 512 Fed. Appx. 71 (2d Cir. 2013) ("Giller's argument therefore amounts to a claim that the arbitrator evaluated the evidence incorrectly. '[T]he Second Circuit does not recognize manifest disregard of the evidence as [a] proper

16

ground for vacating an arbitrator's award.'" (internal citation
omitted)); *Wallace v. Burton*, 378 F.3d at 193 ("'[T]he Second
Circuit does not recognize manifest disregard of the evidence as
proper ground for vacating an arbitrator's award'. . . . A
federal court may not conduct a reassessment of the evidentiary
record . . . ."(internal citation omitted)); *Belesis v. Lowery*,
2015 U.S. Dist. LEXIS 97102, at *5 (S.D.N.Y. July 17, 2015)
("'[T]he Second Circuit does not recognize manifest disregard of
the evidence as proper ground for vacating an arbitrator's
award. Rather, courts 'may look upon the evidentiary record of
an arbitration proceeding . . . only for the purpose of
discerning whether a colorable basis exists for the panel's
award. . . .'" (internal citation omitted)); *Kruse v. Sands
Bros. & Co.*, 226 F. Supp. 2d 484, 488 (S.D.N.Y. 2002) ("Case law
dealing with arbitrator misconduct in the consideration of
evidence has focused exclusively on the arbitrators' refusal to
hear evidence, not their affirmative consideration of
evidence."); *Convergia Networks, Inc.*, 2008 U.S. Dist. LEXIS
92271, at *13-14 (same).

Inficon has cited *Home Indem. Co. v. Affiliated Food
Distribs.*, 1997 U.S. Dist. LEXIS 19741 (S.D.N.Y. Dec. 12, 1997).
Home Indemnity involved a successful challenge to an interim

17

arbitral award issued without reviewing the underlying claim.
The interim award materially prejudiced the other party by
barring access to records "central to the dispute." *Home
Indemnity* does not deal with questions regarding how arbitrators
considered the evidentiary record and does not constitute an
exception to the law established by the cases cited above, and
does not support Inficon's failure to consider the evidence
claim.

Inficon characterizes the Award, contending the Panel
relied on a presumption or waiver of merchantability, instead of
considering "evidence regarding merchantability." (Mem. at 13).
In its Award, the Panel recognized Inficon's contentions that
the sensors were not merchantable, were not CE complaint, had
obsolete part problems - a manufacturability issue - and needed
to be redesigned to improve manufacturability. (Award at 5). The
Panel went on, however, to recite various evidentiary reasons it
considered Inficon's contentions that the sensors were "somehow
defective or not merchantable" not "credible":

> "Inficon conducted many months of due diligence on
> every aspect of the sensors before it closed the APA.
> It plainly considered the sensors merchantable at that
> time, as confirmed by the initial payment of $550,000
> to Verionix.
>
> We do not consider its claims after the fact to be
> credible."

18

Award at 8.

The Panel also noted that "as Inficon learned more about the sensors, it increased the number of sales projected for each remaining year," (*Id.* at 6). Instead of a presumption or waiver of merchantability, the Panel evaluated the evidence and assessed credibility - and determined that Inficon's merchantability contentions were not "credible." (*Id.* at 5).

Inficon has contended that the Award should be vacated under FAA § 10(a)(3) because the Panel allegedly deprived Inficon of fundamental fairness by making a series of comments during the hearing. (Mem. at 12).

FAA § 10(a)(3) has been narrowly construed to avoid impinging on the "broad discretion" afforded arbitrators to decide what evidence should be presented, and cases have recognized the broad latitude arbitrators enjoy in conducting hearings. See *Areca, Inc. v. Oppenheimer & Co.*, 960 F. Supp. 52, 55 (S.D.N.Y. 1997) (citing *Trade & Transport, Inc. v. Natural Petroleum Charterers Inc.*, 738 F. Supp. 789, 792 (S.D.N.Y. 1990), aff'd, 931 F.2d 191 (2d Cir. 1991)); see also *Bell Aerospace Co. Div. of Textron, Inc. v. Int'l Union, United Auto,*

19

*etc.*, 500 F.2d 921, 923 (2d Cir. 1974) (stating that in making evidentiary determinations, arbitrators "need not follow all the niceties observed by the federal courts"); *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 288 (S.D.N.Y. 2007) ("[A]rbitrators are afforded broad discretion to determine whether to hear or not hear evidence, or whether additional evidence is necessary or would simply prolong the proceedings."); *Fine v. Bear Stearns & Co.*, 765 F. Supp. 824, 829 (S.D.N.Y. 1991) ("[P]etitioners' claim that the hearing was unfair amounts to no more than a disagreement with the arbitrators rulings on the weight and relevancy of evidence.").

When Inficon counsel stated "I have one or two questions," he was granted "one more." Counsel asked three questions without interruption, finishing: "I have no further questions." Compl., Ex. 3, 401:2-22. Inficon complains that the Panel "limited cross examination of Verionix expert" when, after 67 pages of cross examination (*id.* at 463:17-548:15.), the Panel's chair asked the Inficon lawyer if he could finish by 5:00 PM, the lawyer responded he thought he could, and the Chair said "go." *Id.* at 529:20-24. Inficon again complains the cross examination was limited when 15 transcript pages later reminded the examining Inficon lawyer was reminded about finishing by

20

5:00, at which point the senior Inficon lawyer agreed "we all need reminders." *Id.* at 544:21-545:3. At 4:55 PM, and after nineteen more pages of cross examination, the Inficon lawyer finished: "I've got no further questions." *Id.* at 548:14-15. The following morning, the Chair asked whether the attorneys had "anything to take up," Inficon offered nothing further. *Id.* at 553:3-13.

Inficon asserts that its redirect examination of a witness was limited when the Chair noted "[i]t's being observed that you're going beyond cross," followed by "[g]o ahead." *Id.* at 1210:16-1211:2. Inficon complains that at the start of the sixth hearing day the Chair noted that the hearing should be completed by the end of day seven. *Id.* at 1407:2-1410:4. After sensor leak testimony by seven different witnesses involving over 100 questions, when an Inficon attorney asked "tell us what a leak is," the Chair interrupted, noting that "the Panel knows what this is about. We've talked about leaks quite a lot." *Id.* at 1656:7-12. Undeterred, the Inficon attorney continued for three more transcript pages asking about a leak shipping hold occurring more than two years after the APA close. Inficon complains about the Chair's statement that "[w]e are getting a little concerned about the time . . . because we still have

21

cross-examination of this witness." *Id.* at 1659:23-1660:2. The Inficon attorney then continued his exam for an additional ten transcript pages, finishing with "I have no further questions." *Id.* at 1670:21-22.

As this Court has held, "[a]n award may be vacated only if a party's right to be heard has been 'grossly and totally blocked.'" *Stifel, Nicolaus & Co. v. Forster*, 2015 U.S. Dist. LEXIS 14970, at *11 (S.D.N.Y. Feb. 6, 2015) (internal citation omitted). Inficon has not established that the hearing was fundamentally unfair or that its right to be heard was "grossly and totally blocked." Although Inficon claims these Panel comments restricted its evidentiary presentation, the failure to identify any evidence it was restricted from presenting requires rejection of Inficon's failure to consider challenge: "even if the Panel erroneously excluded evidence, this would not in itself provide a basis for vacating the award absent substantial harm." *Fine*, 765 F. Supp. at 829; accord *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984) ("[Courts] may vacate only for conduct that has prejudiced the rights of the parties."); *Kruse*, 226 F. Supp. 2d at 488 ("[An] arbitration award must not be set aside on the basis of the arbitrator's refusal to hear evidence that is cumulative or

irrelevant; vacatur is appropriate only when exclusion of relevant evidence so affects rights of a party that it may be said he was deprived of a fair hearing." (citing *Hoteles Condado Beach, La Conch and Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34 (1st Cir. 1985))); *Hunt v. Mobil Oil Corp.*, 654 F. Supp. 1487, 1512 (S.D.N.Y. 1987) (Weinfeld, J.) ("Only the most egregious error which resulted in adversely affecting the rights of a party would justify application of [§ 10(a)(3)] and require vacatur of an award.").

Nor was Inficon's presentation of proof "curtailed." (Mem. at 12). Although Inficon was allotted hearing time through 1:00pm on December 23, Inficon chose to rest on December 22. Having "made the strategic choice not to [use its allotted time] . . . it cannot complain that it was denied a fundamentally fair hearing." *Abu Dhabi Inv. Auth. v. Citigroup, Inc.*, 2013 U.S. Dist. LEXIS 30214, at *9 (S.D.N.Y. Mar. 4, 2013).

For the reasons set forth above, Inficon has not established it was denied fundamental fairness.

**Conclusion**

Based on the conclusions set forth above, the motion to vacate the Award is denied, and the cross-motion to affirm the Award is granted, thereby confirming the Award.

It is so ordered.

New York, NY
April 2/ ', 2016

ROBERT W. SWEET
U.S.D.J.